[Nos. F005660, F006552. Fifth Dist. Jan. 12, 1987.]

SOUTHERN PACIFIC LAND COMPANY et al., Plaintiffs and Appellants; THURNER ENERGY CORPORATION et al., Plaintiffs, Cross-complainants and Appellants, v. WESTLAKE FARMS, INC., et al., Defendants, Cross-defendants and Respondents; BIRD OIL CORPORATION et al., Cross-defendants and Respondents.

**[Opinion certified for partial publication.\*]**

―――――――――――――――――

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

808

COUNSEL

O'Melveny & Myers, Owen Olpin, Bertrand M. Cooper, Cheryl White Mason, Rena L. Ahern, Kimble, MacMichael & Upton, Thomas A. MacMichael, David Douglas Doyle, D. Tyler Tharpe and Kadison, Pfaelzer, Woodard, Quinn & Rossi for Plaintiffs and Appellants and for Plaintiffs, Cross-complainants and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, Oliver W. Wanger, Lawler, Felix & Hall, Mark S. Lee, John G. Wigmore and Pillsbury, Madison & Sutro for Defendants, Cross-defendants and Respondents and for Cross-defendants and Respondents.

OPINION

BROWN (G. A.), P. J.—This proceeding arises out of a controversy among the parties with regard to the interpretation of an oil and gas lease and related disputes. The lease was entered into on September 15, 1980, between West-lake Farms, Inc., Ceil W. Howe and Edwin H. Howe, Jr., as lessors, and American Quasar Petroleum Co. of New Mexico as lessee. American Quasar subsequently assigned the lease to Southern Pacific Land Company. The central dispute is over whether the lease expired.

Under the lease, the primary term expired September 15, 1983. The "habendum" clause of the lease states that "EXCEPT AS OTHERWISE HEREIN PROVIDED," the duration of the lease shall be "... for a term of three (3) years ... and so long thereafter as oil, gas ... or either ... of them ... is produced from said land in paying quantities ...." On September 13, 1983, Southern Pacific started drilling its first well. On September 14, the day before the end of the primary term of three years, Southern Pacific completed drilling its first well on the leased property to a depth of 1,300 feet. The well was plugged

and abandoned as a dry hole without establishing commercial production. Lessee contends, and alleges in its complaint, that under these circumstances the lease did not automatically terminate on September 15, 1983, because paragraph 9 of the lease "otherwise provided" and extended the lease for an additional period of 120 days.

The lessors claimed that the lease terminated at the end of the three-year primary term and thereby prevented the lessee from drilling a second well. On November 12, 1983, prior to the expiration of the 120 days within which drilling of the lessee's second well had to commence, Westlake leased the property to Bird Oil Corporation and Gary-Williams Oil Producer, Inc.

On demurrer, Judge Beck held the lease terminated at the end of the primary term on September 15, 1983. Lessee appealed.

PROCEDURAL BACKGROUND

On November 16, 1983, Southern Pacific Land Company filed a complaint, No. 37526, for declaratory relief, seeking interpretation of the oil and gas lease, breach of contract damages, and damages for slander of title and fraud. The complaint named as defendants Westlake Farms, Inc. and Ceil W. Howe and Edwin H. Howe, Jr., principals in Westlake Farms, as lessors (hereinafter Westlake). Westlake demurred to the complaint on two grounds: (1) failure to join indispensable parties and (2) the lease automatically terminated upon the expiration of the primary term. Judge Beck sustained the demurrer on both grounds and gave Southern Pacific Land Company time to amend to join indispensable parties. As to the second ground, the court sustained the demurrer as to the first, second and third causes of action without leave to amend.[1]

Southern Pacific Land Company filed an amended complaint joining as indispensable parties plaintiff Parejo, Ltd. 1981 (Parejo), Thurner Energy Corporation (Thurner), Conquest Exploration Company (Conquest) and Inca Oil and Gas, Inc. (Inca). To comply with the order of the court, the amended complaint named as nominal defendants Eurafrep, Inc., Conoco, Inc., Getty Oil Company, Trend Exploration, Ltd.,[2] and American Quasar

---

[1]Although not raised by the parties, it appears a judgment of dismissal as to the contractual causes of action, causes of action one, two and three, has not been entered. In the interest of judicial economy, we will direct the trial court to enter a judgment of dismissal nunc pro tunc as to these causes of action; this court will treat the notice of appeal as taken from the judgment to be entered. (*Evola* v. *Wendt Construction Co.* (1958) 158 Cal.App.2d 658, 660 [323 P.2d 158]; *Zellers* v. *State of California* (1955) 132 Cal.App.2d 56, 57 [281 P.2d 296].)

[2]Trend Exploration Ltd.'s appeal has subsequently been dismissed.

Petroleum Co. of New Mexico.[3] The amended complaint alleged fraud and deceit counts which had survived the demurrer, renumbered as the first, second and third causes of action, alleging intentional misrepresentation, negligent misrepresentation and suppression of facts.

Westlake filed a motion for summary judgment directed to the amended complaint. Judge Creede, finding no triable issue of fact as to the fraud and deceit causes of action, granted the motion and entered summary judgment on those causes of action. Southern Pacific, Thurner, Parejo and Conquest appealed. Inca did not appeal, and the summary judgment is final as to it. The appeal from the summary judgment and the appeals from the judgment of dismissal[4] following sustaining the demurrer to the initial causes of action in Southern Pacific's original complaint are numbered F005660.

Thurner and Parejo filed an amended cross-complaint against Westlake, Bird Oil Corporation and Gary-Williams Oil Producer, Inc. for damages. The amended cross-complaint alleged in substance breach of covenant of good faith and fair dealing (first cause of action), breach of contract of surface damage settlement (second cause of action), intentional interference with contractual relations (third cause of action), and unfair business practices (fourth cause of action). Westlake, Bird Oil Corporation and Gary-Williams Oil Producer, Inc. demurred to the amended cross-complaint and concurrently moved to strike the first and second causes of action of the first amended cross-complaint. Judge Eugene W. Krum sustained the demurrer without leave to amend and granted the motion to strike. Parejo and Thurner have appealed from the judgment entered on the ruling. The appeal is numbered F006552 and is consolidated for consideration and disposition with appeal No. F005660.

In summary, these proceedings in this court involve three issues: (1) Did Judge Beck properly sustain without leave to amend Westlake's demurrer to Southern Pacific's original complaint as to the contractual causes of action (first, second and third causes of action in the original complaint)? (2) Did Judge Creede properly grant Westlake's motion for summary judgment as to Southern Pacific, Parejo and Thurner's amended complaint alleging the fraud and deceit causes of action (first, second and third causes of action of the amended complaint)? (3) Did Judge Krum properly grant the motion to strike the first and second causes of action and sustain Westlake's

---

[3]The named nominal defendants, together with Conquest, Inca and Southern Pacific Land Company, have joint interests and have been represented by the same counsel. They will hereinafter be referred to collectively as Southern Pacific unless otherwise indicated.

[4]See footnote 1.

demurrer to Parejo and Thurner's amended cross-complaint without leave to amend?

PART I

*Judge Beck's Decision Sustaining Westlake's Demurrer to Southern Pacific's Original Complaint.*

Judge Beck's decision sustaining the demurrer to the contractual causes of action was based upon the conclusion that the oil and gas lease automatically terminated on September 15, 1983, the expiration date of the primary term of three years, even though a dry hole to a depth of 1,300 feet had been completed and plugged on September 14, 1983.

In his memorandum of decision, Judge Beck said in part: "A plain reading of the dry hole provision of the instant lease shows that this paragraph purports to place upon the lessee the duty to drill a second or subsequent well within 120 days of the completion of a 'dry hole.' Without paragraph 9 of the lease, the lessee might be subject to the argument that the lease was terminated by abandonment even though the instant lease is paid in full for the primary term of the lease. Paragraph 9 of the lease, more importantly, contains absolutely no provision extending the primary period of the lease, nor does it contain any provision preventing the termination of the lease by operation of any other clause of the lease upon the drilling of a dry hole. In each of the cases cited by the Plaintiff, the leases in question contain specific provisions that the lease would not terminate upon the drilling of a dry hole and are, thus, distinguishable from the instant case.

"Although paragraph 9 of the lease may well be surplusage, there is no reasonable interpretation of that paragraph, consistent with the remaining portions of the lease, which would operate to extend the primary term of the lease upon the drilling of a dry hole."

Turning to the pertinent provisions of the lease itself, the habendum clause of the lease provides: "EXCEPT AS OTHERWISE HEREIN PROVIDED, this oil and gas lease shall remain in force for a term of three (3) years from and after the date hereof and so long thereafter as oil, gas, hydrocarbons or associated substances, or either or any of them, is produced from said land in paying quantities and/or so long thereafter as Lessee in good faith (without interruption of more than ninety (90) consecutive days from cessation of production)

shall conduct drilling, redrilling, deepening or remedial operations thereon, and/or so long thereafter as Lessee's drilling, producing or remedial operations or obligations hereunder are suspended or deferred, all as herein provided."

Paragraph 9 of the lease states: "If the Lessee shall elect to drill on said land, as aforesaid, and oil, gas and/or other hydrocarbon substances shall not be obtained in paying quantities in the first well drilled, the Lessee shall, within one hundred twenty (120) days after the completion or abandonment of the first well, commence on said land drilling operations for a second well, and shall prosecute the same with reasonable diligence until oil, gas and/or other hydrocarbon substance are found in paying quantities, or until the well is drilled to a depth at which further drilling would, in the judgment of the Lessee, be unprofitable; and the Lessee shall in like manner continue its operations until oil, gas and/or other hydrocarbon substances in paying quantities are found, but subject always to the terms and conditions hereof and with the rights and privileges to the Lessee herein given. Nothing in this paragraph contained shall require the commencement of drilling operations for the second or any subsequent well (other than an offset well) within three (3) years from the date hereof unless oil, gas and other hydrocarbon substances have been found in paying quantities in any well drilled on said land; however, Lessee shall in any event be obligated to drill offset wells and to protect the leased land against drainage.

The lease was attached to and incorporated into the complaint. **(1a)** The trial court, having sustained Westlake's general demurrer without leave to amend, necessarily concluded that taking the lease within its four corners it had a plain meaning and that it would be inappropriate to receive extrinsic evidence regarding the purpose and effect of the lease, the custom and usage in the oil and gas industry, the practical construction the parties had given the lease and the sense in which the parties had used the words. This was error.

In the landmark case of *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], our Supreme Court made this clear by instructing: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]

"A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear

and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained.

" . . . . . . . . . . . . . . . . .

". . . Accordingly, the meaning of a writing '. . . can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended. [Citations omitted.]' [Citations.]

" . . . . . . . . . . . . . . . . .

"Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (Fns. omitted.) (See *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 527-528 [72 Cal.Rptr. 785, 446 P.2d 785]; *Mobile Oil Corp.* v. *Exxon Corp.* (1986) 177 Cal.App.3d 942, 947-948 [223 Cal.Rptr. 392].)

*People* ex rel. *Dept. of Parks and Recreation* v. *West-A-Rama, Inc.* (1973) 35 Cal.App.3d 786 [111 Cal.Rptr. 197], cited by Westlake, is not to the contrary. That case does not hold that it was improper to initially consider extrinsic evidence for the purpose of explaining the meaning intended by the parties of the words used in the lease. It does hold that after considering such evidence the court erred in using the extrinsic evidence to give the language a meaning to which it was not reasonably susceptible. (*Id.,* at pp. 790-791.)

Westlake argues that Southern Pacific did not offer extrinsic evidence in response to the demurrer and therefore should be precluded from contending on appeal the demurrer should not have been sustained because extrinsic evidence would have been admissible to assist in the interpretation of the lease. The point is without merit.

In ruling on a demurrer, the court must assume the truth of the factual allegations of the complaint. (*Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 517 [150 Cal.Rptr. 1, 585 P.2d 851].) The function of a demurrer is to test the legal sufficiency of the challenged pleading by raising questions of law. (*Whitcombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 702 [141 Cal.Rptr. 189].)

"Because the demurrer tests the pleading alone, and not the evidence or other extrinsic matters, it lies only where the defects appear on the face of the pleading. Objections which do not so appear are raised by the answer." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 894, 895, pp. 333-337.)

Further, there is no waiver by failure to plead what extrinsic evidence will be offered. Where an ambiguous contract is attached and incorporated into the complaint, the party pleading is only required to allege in a complaint the meaning which the party ascribes to that contract. (*Connell* v. *Zaid* (1969) 268 Cal.App.2d 788, 794-795 [74 Cal.Rptr. 371]; see also *Springmeyer* v. *City of South Lake Tahoe* (1982) 132 Cal.App.3d 375, 379 [183 Cal.Rptr. 43].) The complaint in the instant case satisfied those pleading requirements.

We conclude that the trial court should not have ruled on the lease provisions on the assumption that the plain meaning of the words and provisions in the lease prevails. We will therefore vacate the decision on this ground and remand it to the trial court for further proceedings.

However, for whatever guidance and assistance it may be to the trial court in the event no extrinsic evidence is offered or admitted, or, if admitted, it does not aid in the interpretation of the language of the lease or the language used is not reasonably susceptible to the interpretation urged, we express our view of the proper interpretation of the lease based upon the language within the four corners of the instrument.

Where, as here, the issue is one of contractual interpretation and there is no conflicting extrinsic evidence as to the proper interpretation, the issue is a question of law as to which the appellate court is in as good a position as the trial court to pass; accordingly, the appellate court is not bound by the trial court's interpretation and must arrive at its own interpretation de novo. (*Argonaut Ins. Co.* v. *Transport Indem. Co.* (1972) 6 Cal.3d 496, 502 [99 Cal.Rptr. 617, 492 P.2d 673]; *State Farm Mut. Auto. Ins. Co.* v. *Eastman* (1984) 158 Cal.App.3d 562, 566 [204 Cal.Rptr. 827].)

Since there are no California cases directly in point, we rely upon legal principles of interpretation, legal writings on the subject, and some analogous out-of-state precedent.

Under the habendum clause of this lease the primary term is three years, which expands into the secondary term (1) if during the primary term the lessee drills on the premises and discovers oil and/or gas in paying quantities and (2) thereafter so long as oil or gas is produced from the land in paying quantities.

Pursuant to paragraph 8, the lessee paid in full a cash rent for the entire three-year primary term.

Pursuant to paragraphs 7 and 29,[5] the lessee has no obligation to drill on the leased premises within the primary term; further, the lessee can quitclaim the premises at any time during the primary term. However, if the lessee elects to drill and discovers oil and gas in paying quantities, the term is extended indefinitely so long as oil and gas is produced in paying quantities. Under paragraph 10[6] the lessee has a continuous drilling obligation to drill additional wells in accordance with the spacing requirement set forth in the lease until the property is entirely drilled.

Westlake contends that the term of the lease is controlled absolutely by the habendum clause and that the term of the lease cannot be extended by reference to any other provision of the lease. This argument ignores entirely the capitalized introductory phrase of the habendum clause, which states "EXCEPT AS OTHERWISE HEREIN PROVIDED, this oil and gas lease shall remain in force . . . ." It expressly provides that the primary term of the lease is subject to modification and enlargement by other provisions in the lease. This interpretation is supported by several out-of-state cases and by legal writings on the subject. (See *Stanolind Oil & Gas Co.* v. *Newman Brothers Drill. Co.* (1957) 157 Tex. 489 [305 S.W.2d 169, 173]; accord *Phillips* v. *Suntex Oil & Gas Company* (Tex.Civ.App. 1967) 419 S.W.2d 422, 427-428;

---

[5]Paragraph 7 in relevant part provides: ". . . or it may at any time within said period terminate this lease and surrender the land as hereinafter provided. No implied covenant shall be read into this lease requiring the Lessee to drill or to continue drilling on said land, or fixing the measure of diligence therefor. Lessee may elect not to commence or prosecute the drilling of a well on said land as above provided and thereupon this lease shall terminate."
Paragraph 29 in relevant part provides: "Lessee may at any time quitclaim this lease in its entirety, . . ."
[6]Paragraph 10 of the lease provides in part: "If oil, gas and/or other hydrocarbon substances are found in paying quantities in any well so drilled by Lessee on said land, Lessee, subject to the provisions hereof and to the suspension privileges hereinafter set forth, shall continue to drill additional wells on said land . . . ."

*St. Louis Royalty Co.* v. *Continental Oil Co.* (5th Cir. 1952) 193 F.2d 778, 780; 3 Williams, Oil and Gas Law (1984) § 603.6, p. 40.)

Thus, habendum clauses are not necessarily tightly circumscribed aspects of a lease instrument with a life of their own, unaffected by any remaining terms and/or conditions: "It will be noted that the habendum clause does not merely provide for a term of five years and as long thereafter as production continues. Nor does it purport to make only the primary term subject to the other provisions of the lease. Instead it provides that 'subject to the other provisions herein contained, this lease shall be for a term of five (5) [years] . . . and as long thereafter as oil, gas or other mineral is produced . . . .' The stipulation for a term of five years and as long thereafter as production continues is thus both modified and enlarged by the recital that it is subject to the other lease provisions, and is required to yield to any and all other provisions which affect the duration of the lease. It is clear then that the lease may be kept in force after the end of the primary term either by production or by operation of its other provisions." (*Stanolind Oil & Gas Co.* v. *Newman Brothers Drill. Co., supra,* 305 S.W.2d at p. 173.)

Paragraph 9 is the only paragraph in the lease, other than the habendum clause, that potentially deals with extending the primary term in the absence of production, and hence offers the only explanation for the proviso in the habendum clause.

As it relates to the habendum clause, paragraph 9 is by its terms a clause that "otherwise provides." Paragraph 9 governs when, as in the instant case, the first well commenced within the three-year primary term turns out to be a dry hole. It gives the lessee the right to continue exploration if the first well is a dry hole. When the first well is completed just before the end of the primary term and turns out to be a dry hole, the 120-day period from the completion or abandonment of the well falls in the secondary term. Paragraph 9 nowhere states that the right to continue drilling wells at 120-day intervals ceases at the end of the primary period as Westlake suggests.

Moreover, the second sentence of paragraph 9 confirms that the continuous drilling provision was intended to operate beyond the first three years. The second sentence provides that, notwithstanding the first sentence, the lessee has no obligation to commence the second or any subsequent well during the first three years. In other words, the obligation to drill continuously to prevent the lease from terminating has no application during the primary term. Unless the second sentence was meant to vitiate the first entirely, it necessarily implies that the right to continue exploration after the drilling of a dry hole may be exercised by drilling a second well within a

120-day period that extends beyond the three-year primary term. But even without reference to the second sentence of paragraph 9, the meaning ascribed to continuous drilling clauses, regardless of the date of the operative act (i.e., drilling a dry hole), is that they prolong the lease. A succinct exposition of this point is contained in *Phillips* v. *Suntex Oil & Gas Company, supra,* 419 S.W.2d at page 427: "As was the case in Stanolind, the sixty-day clause deals with only two fact situations. The first is where a dry hole or holes are drilled prior to the discovery of oil or gas. The second is where after discovery of oil or gas, production ceases from any cause. The second clause is not applicable here. The Supreme Court of Texas in Stanolind held that the sentence comparable to our first sentence in Paragraph 5 provides that in either of the two fact situations mentioned the lease may be kept in force by additional drilling begun within sixty days. The Court then stated: '*By necessary implication the lease may be kept in force by the additional drilling or reworking operations in either fact situation whether occurring within or after the end of the primary term.*' " (Fn. omitted; italics added.)

If the continuous drilling provision of paragraph 9 does not operate beyond the primary term, it appears to serve no purpose in the lease whatsoever and Judge Beck's classification of paragraph 9 as mere surplusage would be correct. Unless the 120-day provision in paragraph 9 serves to extend the term beyond the primary term, it serves no purpose because the lessee has no obligation to drill within the 120 days. Westlake conceded at oral argument that Southern Pacific had no obligation to drill within a 120-day period during the primary term.

Further, the overall structure of the lease indicates that paragraph 9 was not intended merely to prevent abandonment of the lease during the primary term. Historically, the issue of termination during the primary term arose as a corollary of the implied covenant to diligently develop the property. The failure to immediately drill another well following completion of a dry hole could be interpreted to mean that the lessee had abandoned the purpose for which the lease was given and had thereby forfeited its rights thereunder. Thus, dry hole clauses are sometimes included in leases to specify the interval within which additional drilling will be deemed to preclude any finding of abandonment during the primary term.

Any potential role that the continuous drilling language might play in avoiding termination of the lease during the primary term is negated by the second sentence. Further, there is no need for paragraph 9 to address the possibility of termination during the primary term because of the provisions of paragraphs 7, 8 and 29.

In the instant lease the potential issue of abandonment is eliminated by paragraphs 7, 8 and 29. Paragraph 7 (see fn. 5, *ante*) gives the lessee three years to commence drilling. Moreover, paragraph 7 expressly states that no implied covenant to conduct continuous drilling shall be read into the lease. Paragraph 29 (see fn. 5, *ante*) permits the lessee to quitclaim the leasehold at any time. Paragraph 8 recites that the lease has been fully paid for the entire three-year primary term. The combined effect of these paragraphs is to provide that, in the absence of production, the lease is guaranteed during the primary term, whether the lessee elects not to drill at all or drills one or more dry holes and then elects to defer further drilling. Thus any suggestion that the drafters included paragraph 9 solely to address an issue of abandonment during the primary term, which could not possibly arise under the lease, appears to be meritless.

Treatises on oil and gas law generally support this position. Those authorities explicate that it is common for the habendum clause to be modified by other clauses in the lease which may have the effect of extending the duration of the lease beyond the primary term in the absence of commercial production. (2 Kuntz, A Treatise on the Law of Oil and Gas (1964) § 26.13, at pp. 312-320; 3 Williams, Oil and Gas Law, *supra*, § 602, at pp. 13-15.) Clauses which deal with rights and obligations of the lessee following the drilling of a dry hole, as does paragraph 9 of the lease in the instant case, are frequently designed to have this effect. "As it relates to the habendum clause, the dry hole or resumption of operations clause is designed to preserve the rights of the lessee and to continue the lease in effect . . . ." (2 Kuntz, *supra*, § 26.13, at p. 319.) "Some dry hole clauses are designed to give the lessee a stated period of time subsequent to the completion of a dry hole to commence new operations, even if such stated period of time extends into the secondary term." (3 Williams, *supra*, § 613.4, at pp. 227-228.)

The trial court's interpretation that paragraph 9 of the lease may well be surplusage also requires that an important reference to the dry hole clause in paragraph 31 of the lease be ignored. That paragraph, dealing with assignments of the leasehold, provides in part that upon the assignment of the lease as to "a particular part or parts of the leased land" the owners of the divided portions need comply with the lease only as to their respective portions. Despite this separation of the lease for compliance purposes, paragraph 31 goes on to say "provided further that the commencement of the drilling operations and the prosecution thereof, as provided in paragraphs 7, 9, 10 and 11 hereof, either by the Lessee or any assignee hereunder shall protect the lease as a whole." This clause, which is typical in oil and gas leases (see 3 Kuntz, A Treatise on the Law of Oil and Gas (1967) § 35.4, pp. 168-170; 4 Williams, Oil and Gas Law, *supra*, § 677.3, pp. 242-243), reflects the under-

standing of the parties that paragraph 9 is a provision which serves to protect the lease. This subsequent reference to paragraph 9 in its intended scope appears wholly inconsistent with Judge Beck's conclusion that paragraph 9 may well be surplusage to which the parties attached no independent meaning.

Moreover, the adoption of a construction of the lease which requires a portion of the lease to be treated as meaningless (as in the case of the express exception in the capitalized portion of the habendum clause) or surplusage (as in the case of the second sentence of paragraph 9), when another interpretation serves to harmonize all the provisions in the lease, is contrary to established principles. ■ " 'Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract.' " (*Anderson* v. *Badger* (1948) 84 Cal.App.2d 736, 742 [191 P.2d 768]; see also Civ. Code, § 1652 and *Sands* v. *E.I.C., Inc.* (1981) 118 Cal.App.3d 231, 235 [173 Cal.Rptr. 342].) "Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement, and this purpose should not be thwarted except in the plainest case of necessary repugnance. Even where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, if possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part." (*Woods* v. *Sims* (1954) 154 Tex. 59 [273 S.W.2d 617, 620-621]; see also Civ. Code, § 1641; *Ghirardelli* v. *Peninsula Properties Co.* (1940) 16 Cal.2d 494, 496 [107 P.2d 41].)

■ Westlake contends that the *force majeure* provision contained in paragraph 30 of the lease limits the application of paragraph 9 and reiterates the parties' overriding intent that production in paying quantities be obtained within three years. The *force majeure* clause excuses performance by the lessee when compliance is prevented by law, war, riots, strikes, lockouts, action of the elements, etc., subject to the following express limitation: ". . . provided that nothing herein contained shall extend the time limit for commencement and prosecution of drilling operations pursuant to Section 7 hereof nor shall extend the three (3) year primary term of this lease within which production in paying quantities must be obtained; . . ."

Accordingly, as Westlake's argument goes, neither forces beyond the lessees' control nor a dry hole drilled, plugged and abandoned one day before the expiration of the primary term can extend the lease beyond its three-year primary term. Thus Westlake would read this language, which is designed

simply to limit the scope of the *force majeure* clause, in a manner that would make the proviso in the habendum clause meaningless and would vitiate entirely the continuous drilling provisions in paragraph 9. As Southern Pacific properly notes, such a reading contravenes traditional rules of construction, which require the lease to be read as a whole in a manner which reconciles apparent repugnancies and, to the extent possible, gives some meaning to each clause in the lease. (*Dabney* v. *Edwards* (1935) 5 Cal.2d 1 [53 P.2d 962]; *Anderson* v. *Badger, supra,* 84 Cal.App.2d at p. 742; see also *Sands* v. *E.I.C., Inc., supra,* 118 Cal.App.3d at p. 235.) At most, the repugnancy between the two provisions gives rise to a facial ambiguity which invites the admission of extrinsic evidence to aid in the interpretation of these provisions.

These rules of construction have particular application in this case since Westlake admitted that the language in the *force majeure* clause barring extensions beyond "the three (3) year primary term of this lease within which production in paying quantities must be obtained" cannot be applied literally in all circumstances. Westlake conceded that if Southern Pacific was actually drilling its first well on the day the primary term ended and thereafter completed it as a producer, the lease would have been extended even though commercial production had not been achieved during the primary term.

Westlake attempts to refute the conclusions we have arrived at by (1) ignoring the capitalized introductory phrase to the habendum clause and arguing that the habendum clause controls the terms of the lease and that it is not permissible to look outside the habendum clause itself to determine how long an oil and gas lease may endure, and (2) attempting to distinguish the out-of-state cases we have relied upon (see *ante,* p. 819) by pointing out that the dry hole clause in each of those cases contained the phrase "this lease will not terminate."

Turning first to the argument that the habendum clause controls the term in all circumstances, Westlake cites several California cases. However, upon analysis it is clear that those cases are not controlling as the issues and facts being addressed are different, none involved a lease with a fully paid up primary term, and none involved a dry hole clause having no conceivable application except after the primary term, as in this case.

In fact, one of those cases, *Valer Oil Co.* v. *Souza* (1960) 182 Cal.App.2d 790, 798 [6 Cal.Rptr. 301], specifically recognizes that the term established by the habendum clause may be "properly modified by other provisions, . . ." Further, *Valer* contained a dry hole clause that had the admitted capacity

to extend the lease had the lessee drilled a second well in the permitted time period.

Other cases cited are *Renner* v. *Huntington etc. Oil & Gas Co.* (1952) 39 Cal.2d 93, 98-100 [244 P.2d 895]; *Macco Construction Co.* v. *Fickert* (1946) 76 Cal.App.2d 295, 302-303 [172 P.2d 951]; *Stetson* v. *Orland Oil Syndicate, Ltd.* (1940) 42 Cal.App.2d 139, 142 [108 P.2d 463]; and *Moon* v. *Marker* (1938) 26 Cal.App.2d 33, 36-37 [78 P.2d 460]. We do not propose to extend this opinion by setting forth our analysis of the distinguishing features in each case. Suffice it to say that we have analyzed those cited cases and others and are satisfied that they do not stand for the proposition urged by Westlake, that in all circumstances the habendum clause controls the term of the lease without reference to other provisions in the lease, particularly where, as here, the habendum clause itself expressly states: "EXCEPT AS OTHERWISE HEREIN PROVIDED . . . ."

Westlake's second argument is that all of the out-of-state cases upon which Southern Pacific relies (see pp. 818-819, *ante*) are distinguishable because those cases contained a provision stating "this lease will not terminate" following the drilling of a dry hole if the lessee continues to drill after the expiration of the lease within a certain number of days after drilling the dry hole. The lease involved herein did not contain such a provision, and Judge Beck in his decision distinguished these cases on that ground. Westlake concludes Southern Pacific would have the court rewrite the dry hole provision by reading this phrase into the lease.

Westlake argues that the Supreme Court rejected such an effort in *Renner* v. *Huntington etc. Oil & Gas Co., supra,* 39 Cal.2d 93. However, *Renner* is inapposite. That case had nothing to do with a dry hole or a continuous drilling operation clause and thus does not call into question the interpretation of clauses central to the issues in this case.

It appears to us that the clause referred to is not the critical determinant of the conclusion that the dry hole clause can extend the primary term. To the contrary, in each of the three Texas cases cited, the decisive factor was the express language in the habendum clause which made the habendum "subject to" other lease provisions. It appears to us that the phrase "this lease will not terminate" served only to identify the particular dry hole clauses as provisions which affected the duration of the lease and therefore modified the habendum. Neither Westlake nor Judge Beck cited any authority to the contrary.

Thus, we are of the opinion that, looking alone to the language within the four corners of the instrument and without the aid of extrinsic evidence,

Judge Beck erred in holding the dry hole provision did not extend the lease beyond the primary term. However, as we have hereinabove concluded, the final interpretation of the lease should not be made without consideration by the trial court of any extrinsic evidence the parties may desire to introduce pursuant to the principles of *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33.

Accordingly, the judgment of dismissal after sustaining the demurrer to the first three causes of action of the original complaint will be vacated with directions to overrule the general demurrer.

Having so concluded, it is unnecessary for us to pass upon the issue raised by Parejo, Thurner, Conquest, American Quasar Petroleum Company of New Mexico and Eurafrep, Inc. to the effect that because they were not made parties to the action until after the demurrer was sustained, they are not bound by Judge Beck's ruling.

PARTS II, III*

. . . . . . . . . . . . . . . . . . . . . .

PART IV

*Appealability*

■ Because of the pendency of an undisposed-of cross-complaint in the trial court filed by Westlake, the question of the appealability of the judgments from which the appeals have been taken has been raised and briefed by the parties. The cross-complaint names as cross-defendants Southern Pacific and the other parties who are parties to the complaint, amended complaint and cross-complaint of Parejo and Thurner. The issues raised by the complaint, amended complaint and cross-complaints are inextricably intertwined. The gravamen of the eight causes of action of the cross-complaint of Westlake is that the cross-defendants intentionally interfered with Westlake's ability to explore, drill and produce oil and gas from the lands covered by the lease by insisting the term of the lease was extended beyond the September 15, 1983, expiration date.

We have concluded that the judgments on the complaint, amended complaint and cross-complaint are not final because of the pendency of the

---

*See footnote on page 807, *ante.*

undisposed-of cross-complaint of Westlake and therefore are not appealable. (Code Civ. Proc., § 904.1; *Nicholson* v. *Henderson* (1944) 25 Cal.2d 375, 378-381 [153 P.2d 945]; *Lemaire* v. *All City Employees Assn.* (1973) 35 Cal.App.3d 106, 109-110 [110 Cal.Rptr. 507]; *Krug* v. *Meehan* (1951) 106 Cal.App.2d 554, 555-556 [235 P.2d 410].)

 Southern Pacific has requested that the appeals be treated as petitions for peremptory relief, and we have concluded under the circumstances that it would be in the interests of justice and contribute to the expeditious disposition of this entire controversy to do so. (*Olson* v. *Cory* (1983) 35 Cal.3d 390, 400-401 [197 Cal.Rptr. 843, 673 P.2d 720]; *Barnes* v. *Molino* (1980) 103 Cal.App.3d 46, 50-51 [162 Cal.Rptr. 786]; *Branham* v. *State Farm Mut. Auto. Ins. Co.* (1975) 48 Cal.App.3d 27, 32-33 [121 Cal.Rtpr. 304].)

As we have pointed out in the opinion, the issues in the fraud cause of action in the amended complaint and the issues in the amended cross-complaint filed by Thurner and Parejo against Westlake, Bird Oil and Gary-Williams are substantially governed by the ultimate determination on the complaint as to whether the lease was or was not extended beyond September 15, 1983. Likewise, the ultimate disposition of the issues on Westlake's undisposed-of cross-complaint appears to substantially rest upon the determination of this identical issue. The lease interpretation issue is pivotal to the parties' affirmative claims and critically impacts the parties' ability to defend against the cross-complaints.

To dismiss the appeals at this point would not expedite disposition of this case. Dismissal would require the parties to return to the trial court to await the trial on the cross-complaint filed by Westlake which, as we understand from oral argument, has not been pressed to trial pending the determination of these appeals. The crucial issue which is determinative of the litigation would not be determined by the trial. However, that issue will be determined if these pending cases are returned for trial with the directions we have given.

The parties have thoroughly briefed the lease interpretation issue, and all the other conditions necessary for issuing a writ of mandate are present. Where that is the situation and where refusal to decide the issues raised by the improvident appeals would result in unnecessarily dilatory and circuitous litigation, the court has the power to treat the appeals as petitions for mandate. (*Olson* v. *Cory, supra,* 35 Cal.3d 390.) We proceed to do so.

## DISPOSITION

The trial court is directed to enter a judgment of dismissal nunc pro tunc as of the earliest date the judgment could have been entered on Judge Beck's

order sustaining the demurrer without leave to amend as to the first, second and third causes of action (contract causes of action) in the original complaint filed by Southern Pacific. The appeal is deemed to have been taken from the judgment of dismissal.

The appeals from the judgments are deemed to be petitions for mandate.

Let a peremptory writ of mandate issue directing the trial court to: 1. Vacate its judgment of dismissal as to the first, second and third causes of action of the complaint and to enter an order overruling the general demurrer to those causes of action.

2. Vacate its summary judgment in favor of Westlake on the first, second and third causes of action (fraud causes of action) of the amended complaint filed by Southern Pacific, Parejo, Thurner and Conquest and to enter an order denying Westlake's motion for summary judgment.

3. Vacate its judgment of dismissal as to the second, third and fourth causes of action in the amended cross-complaint filed by Parejo and Thurner against Westlake, Bird Oil Company and Gary-Williams Oil Producer, Inc. and enter a new judgment denying the motion to strike the second cause of action and a new order overruling the general demurrer to the third and fourth causes of action.

As to the judgment of dismissal of the first cause of action of the cross-complaint, relief is denied.

Each party to bear its/his own costs in this court.

Woolpert, J., and Best, J., concurred.

A petition for a rehearing was denied February 6, 1987, and the petition of all respondents for review by the Supreme Court was denied March 25, 1987.