See also 880 F.2d 176.

**AIR–SEA FORWARDERS,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–750C.**

United States Court of Federal Claims.

Oct. 22, 1997.

Kenneth S. Nankin, Washington, DC, for plaintiff.

Ronald G. Morgan, Department of Justice, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk Manhardt, Assistant Director, Washington, DC, for defendant. Kathleen A. McGinn, Central Intelligence Agency, of counsel.

## OPINION

BRUGGINK, Judge.

Plaintiff, Air–Sea Forwarders, Inc. ("ASF"), has appealed the decision of a contracting officer denying its claim for damages for breach of an alleged oral contract between plaintiff and the Central Intelligence Agency. This matter is before the court on the government's alternative motions to dismiss or for summary judgment. For the reasons discussed below, the government's motion for summary judgment is granted.

### FACTUAL BACKGROUND [1]

Prior to 1957, ASF, a California corporation, began performing international freight-forwarding and customhouse brokerage services for Asiatic Aeronautical Company, Ltd. In 1958, Asiatic Aeronautical was succeeded by Air Asia Company, Ltd.[2] At some point, ASF became the exclusive provider of freight-forwarding and customhouse brokerage services to Air Asia. These services were provided in the absence of any written agreement until August 1, 1966, at which time a written freight-forwarding contract was executed between ASF and Air Asia. This contract provided for automatic annual renewal, unless terminated upon written notice not less than thirty days prior to renewal, and contained the following integration clause:

> This agreement contains the entire and only agreement between the parties hereto respecting the subject matter hereof and any representation, promise or condition in connection therewith not incorporated herein shall not be binding upon either party. No change, modification or waiver of this agreement shall be binding upon either party hereto unless it is made in writing and appropriately executed by the duly authorized representatives of the parties.

Beginning in 1957, ASF also entered into a series of written contracts with Air Asia to perform export packing services. Under the terms of the export packing contracts, Air Asia was to pay ASF its actual costs for export packing operations plus a fixed price.

There is, however, more to the relationship between ASF and Air Asia than first meets the eye. Air Asia was a "proprietary company" of the CIA—in other words, a "cover" used to disguise CIA intelligence activities. Specifically, Air Asia was engaged in providing aircraft maintenance, airplane and military parts, and support services for CIA intelligence operations in Southeast Asia and other locations worldwide.

According to ASF, its owner and president, Mr. Erwin Rautenberg, was made officially "witting" to the CIA's ownership of Air Asia in 1956 when he was approached by the CIA and Air Asia to participate in a ruse that would involve ASF. The plan was to create the appearance that ASF, which already was performing *bona fide* freight-forwarding and customhouse brokerage services for Air Asia, was also performing Air Asia's export packing operations. This deceit was necessary, according to plaintiff, because Air Asia was paying unnecessary taxes to California and

---

1. The facts are drawn from the complaint, plaintiff's submissions, and exhibits attached by the parties, the contents of which are not contested.

2. For purposes of this opinion, "Air Asia" refers to both Air Asia Company, Ltd., and Asiatic Aeronautical Company, Ltd.

its "cover" was being jeopardized by the suspicions of its employees' union leadership.

Plaintiff agreed to help implement the ruse by permitting the CIA and Air Asia to use the ASF name in a series of sham transactions and other pretenses. For instance, ASF signed written, but bogus, contracts with Air Asia to provide export packing services—hence the packing contracts referenced above. In reality, no actual packing services were ever provided by ASF. To further create the appearance that actual packing services were being provided by ASF, all Air Asia export packing employees were ostensibly transferred to the payroll of ASF, and a separate bank account was opened in ASF's name ("Valley Branch account") that was used to pay for various expenses, including labor costs, associated with the bogus ASF packing operations. The idea was to make the outside world believe that ASF was performing export packing operations for Air Asia using ASF employees when, in reality, Air Asia continued to pay for and direct the operations as before. The scheme accomplished its goals because it enabled the CIA and Air Asia to take advantage of a tax loophole and diverted union leadership's attention from the true nature of Air Asia's activities.

In exchange for participating in this ruse, ASF received a variety of promises from the CIA and Air Asia. The most relevant of these were that (1) Air Asia would not terminate the *bona fide* commercial freight-forwarding arrangement with ASF without good cause;[3] (2) the monthly payments to ASF under the export packing contracts would, in fact, be paid for accounting services rendered by ASF in connection with the sham Valley Branch account; (3) Mr. Rautenberg would

never be asked to do anything illegal; and (4) ASF and Mr. Rautenberg would be indemnified by the CIA and Air Asia for all expenses, liabilities, and attorneys fees arising from the special arrangement between ASF and Air Asia. Due to the need for secrecy, the arrangement was negotiated and agreed to orally—there could be no paper trail jeopardizing the secrecy of Air Asia's activities.

In 1975, the CIA transferred formal ownership of Air Asia to E–Systems, Inc. According to plaintiff, this transfer was in form only, and Mr. Rautenberg was informed by a number of CIA or Air Asia employees, including Air Asia's president, that the CIA continued to own and control Air Asia, albeit in a "different wrapping."[4] E–Systems' acquisition of Air Asia did not affect the relationship between ASF and Air Asia until 1981, at which time Air Asia terminated ASF as its freight forwarder and customhouse broker.

ASF immediately filed suit against Air Asia and E–Systems (but not the CIA) in federal district court in California. The facts alleged in the California action are essentially identical to the facts alleged in the current complaint. The CIA "observed" the proceedings, but did not become formally involved other than by producing documents in response to ASF's discovery requests and obtaining a protective order (still in effect today) which restrained Mr. Rautenberg from divulging certain information not essential to resolving the current action.[5] Eventually, the case was tried and the jury returned a verdict in favor of ASF that was reversed JNOV by the district judge. ASF appealed and the Ninth Circuit reversed the district judge in part, but remanded the case for a

---

**3.** According to plaintiff, ASF also agreed not to terminate the oral arrangement without good cause.

**4.** *See* Plaintiff's Supplemental Filing In Opposition, Ex. B (Tr. of Mr. Rautenberg's testimony):

Q. Did Mr. Wueste [President of Air Asia] tell you anything about whether or not Air Asia would continue to be owned by the Government, or words to that effect?
A. He told me that nothing would change. It would be the same thing, just in a different wrapping. Just—that's what he explained to me.

And the same thing was told to me by Mr. Wall [manager of Air Asia's North Hollywood facility].

**5.** This protective order, obtained by the government upon an *ex parte* application, was itself the subject of litigation. Initially, not only were the terms of the order required to be kept secret, but so was its very existence. Mr. Rautenberg was shown the order and instructed to memorize its terms—no copies or notes were allowed to be made. The Supreme Court eventually modified the order so that its existence could be discussed, but kept its terms secret. This court has reviewed the order *in camera*.

new trial. *See Air–Sea Forwarders, Inc. v. Air Asia, Ltd.,* 880 F.2d 176 (9th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 868, 107 L.Ed.2d 952 (1990).

At some point during die California action, settlement discussions among ASF, Air Asia, and E–Systems began. Mr. Rautenberg, believing that the protective order prohibited him or ASF from suing the CIA directly, hoped that ASF's claim against the CIA would be resolved in connection with a settlement in the California action. However, it came to appear unlikely that the California action would settle, and ASF filed a claim with a CIA contracting officer, Robert F. Reynolds, on May 22, 1995. Eventually, the parties to the California action (but not the CIA) successfully concluded settlement negotiations, a settlement among ASF, Air Asia, and E–Systems was executed, and the California action was voluntarily dismissed on August 1, 1996. In the meantime, however, Reynolds had denied ASF's written claim against the CIA. This action, an appeal by ASF of the Reynolds' final decision dated November 29, 1995, followed.

### ISSUES PRESENTED

Defendant presents a battery of defenses to plaintiff's claim in its motion. The court, however, will only address two: (1) whether ASF released its claims against the CIA when it settled the California action; and (2) whether the "secret services" doctrine enunciated in *Totten v. United States,* 92 U.S. 105, 23 L.Ed. 605 (1875), bars plaintiff's claims.[6]

### DISCUSSION

*I. Plaintiff Has Released All Its Claims Against The CIA*

Between late-June and early-July 1996, ASF, Air Asia, and E–Systems brought the California action to a close by entering into an "Agreement for Settlement, Release, and Accord and Satisfaction." Paragraph 3 of the settlement agreement contains a release

paragraph, which provides in pertinent part as follows:

> 3. [P]laintiff absolutely and forever releases and discharges Defendants of and from any and all claims, demands, damages, debts, liabilities ... and causes of action of every kind and nature whatsoever ... which it now has, owns or holds, or at any time before ever had, owned or held, as encompassed in Plaintiff's Complaint in the above-referenced lawsuit ... ("released matters").

As previously mentioned, the claims asserted in the California action and the instant action are substantially the same. In the complaint filed in the California action, ASF alleged, *inter alia,* that:

- Mr. Rautenberg was approached by high officials of Air Asia to lend ASF"s name for the establishment of a "covert" or "front" ASF located within Air Asia's premises, but which was completely controlled by and fully dependent on Air Asia. ¶ 16.[7]

- In 1956, Air Asia and its CIA principals devised a plan by which the export packing in Burbank would be done in ASF's name in order to shield Air Asia from the taxing authorities and other inquisitive outsiders. ASF would not actually do the export packing. Only its name would be used, along with pseudo documentation, to satisfy the tax authorities. ¶ 18.

- In 1956, the special arrangement between Air Asia (and its CIA principals) and ASF was solidified by a secret and verbal agreement. ¶ 20.

- For cover purposes, Air Asia and its CIA principals would have the unrestricted use of the name, good will, and reputation of ASF. ¶ 20(e).

- The covert ASF would ostensibly assume Air Asia's existing contract with the International Brotherhood of Teamsters Union, and would honor its

---

6. In response to the court's request at oral argument, the parties filed supplemental briefs on *Totten 's* application in this case.

7. Citations are to the numbered paragraphs of the Second Amended Complaint filed in the California action, and attached by the government as an exhibit to the pending motion for summary judgment.

terms and conditions as a front for defendants. ¶ 20(m).

- A separate bank account was established in ASF's name, but which was wholly funded and controlled by Air Asia in connection with the covert ASF. ¶ 20(p).

In exchange for agreeing to this unusual arrangement, ASF allegedly received a variety of oral promises from Air Asia and its CIA principals, including:

- ASF would be Air Asia's exclusive international freight-forwarder and customhouse broker. ¶ 21(a).
- The 1956 oral agreement could only be terminated for good cause. ¶ 21(b).
- Air Asia would pay a monthly amount sufficient to defray the overt ASF's bookkeeping costs. ¶ 21(g).
- Air Asia would not do anything in the name of ASF or Rautenberg that was illegal or would tarnish their reputation. ¶ 21(d).
- Air Asia and its CIA principals would indemnify ASF in the event of problems arising from the special relationship. ¶ 21(l).

Comparing the instant action with the California action, it is clear that both suits are based on the same alleged special relationship between ASF and Air Asia, the same alleged oral agreement, and the same alleged breach.

■ In addition to releasing ASF's claims against Air Asia and E–Systems, the agreement settling the California action also contains a provision that expands the number of persons entitled to the benefit of the release:

8. The releases in this Agreement shall extend and inure to the benefit of each released party and each of their past and present ... alter egos [and] shareholders. . . .

8. Plaintiff also attached testimony given by Mr. French, an acknowledged CIA employee, during the California action to the effect that Air Asia was owned by the government.

9. Defendant has contended, in the alternative, that at the time of the alleged breach in 1981, neither Air Asia nor E–Systems was controlled by

The term "alter ego" is not defined in the settlement agreement. However, a corporation is considered the "alter ego" of another where such a unity of interest, ownership and control exists between the two, generally a parent corporation and its subsidiary, that their separate personalities no longer exist. Cf. *Twin City Shipyard, Inc. v. United States*, 21 Cl.Ct. 582, 590 (1990) (discussing alter-ego doctrine as applied in Federal Circuit); *Doney v. TRW, Inc.*, 33 Cal.App.4th 245, 39 Cal.Rptr.2d 292, 293 (1995) (same in California).

■ Plaintiff's allegations, assuming them to be true, compel the conclusion that the CIA was Air Asia's alter ego when the events at issue occurred. Plaintiff consistently refers to Air Asia as "the CIA/Air Asia" or "Air Asia and its CIA principals." [8] ASF also variously asserts that: (1) Air Asia was a CIA "proprietary company;" (2) Air Asia's primary function was to maintain and service the CIA's clandestine airlines; (3) Air Asia's employees were unwittingly working for the CIA; and (4) the CIA funneled many millions of dollars to Air Asia through the sham ASF. Moreover, according to hearsay that ASF attributes to high-level CIA and Air Asia officials, nothing changed about this basic arrangement when Air Asia was sold to E–Systems, and the CIA continued to own or a least control Air Asia, albeit "in a different wrapping." Thus, absent other considerations, plaintiff's assertions here require the conclusion that ASF released its claims against the CIA as Air Asia's alter ego. Indeed, if the CIA were not an alter ego of Air Asia and E–Systems, the complaint would fail for lack of privity.[9]

There are, however, other considerations. Plaintiff argues that paragraph 5 of the settlement agreement specifically reserved the instant action from the scope of release contained in paragraphs 3 and 8. Paragraph 5 reads as follows:

the CIA. Plaintiff has asserted, and offered limited evidence, that Air Asia and E–Systems continued to be controlled by the CIA during the critical period. Plaintiff cannot have it both ways. Either it released the claims against the CIA, or there is no privity of contract with the CIA.

5. While this release resolves all assertions of damage relating to *released matters as specified in paragraph 3*, it does not extend to any rights or remedies for *matters* which Plaintiff may have against any third party, including the United States Government. (Emphasis added).

According to ASF, "it is logically impossible to give *full* effect to both provisions [paragraphs 5 and 8]," since paragraph 5 reserves ASF's right to sue the CIA and paragraph 8 extends the release to encompass CIA. Because there is a conflict, ASF argues that paragraph 8 (asserted to be the more general) must yield to paragraph 5 (asserted to be the more specific), and that therefore the release does not affect ASF's claims against the government.

The government, on the other hand, argues that paragraph 5 only reserves ASF's "independent causes of action" (i.e., those not based upon the actions of Air Asia) against third parties, including the CIA. Because the paragraphs deal with different types of claims—those arising from the facts alleged in the complaint versus all others—the government concludes that the paragraphs are not in conflict, and that therefore ASF has released its pending claim against CIA.

The court observes that paragraph 5 reaffirms the general release of paragraph 3 with respect to "released matters," but also limits paragraph 3 by reserving ASF's right to assert claims for "matters" (not "released matters") which ASF might have against third parties, including the government. Thus, paragraph 5 draws a distinction between "released matters" on the one hand, which are defined in paragraph 3 as ASF's claims against Air Asia and E–Systems (and their alter egos under paragraph 8) as encompassed by the complaint in the California action, and unspecified other "matters" for which ASF might have a claim against third parties. A conflict, therefore, exists only if paragraph 5 is interpreted in a manner that disregards the parties' own definition of "released matters" and collapses the similar, but different, terms "released matters" and "matters."

Under California law, which controls the interpretation of the settlement agreement,

the release must be "read as a whole in a manner which reconciles apparent repugnancies and, to the extent possible, gives some meaning to each clause in the [release]." *Southern Pac. Land Co. v. Westlake Farms*, 188 Cal.App.3d 807, 233 Cal.Rptr. 794, 804 (1987). The interpretation of the release is a matter of law that is appropriately resolved by summary judgment. *Kenbridge Const. Co. v. United States*, 28 Fed.Cl. 762, 765 (1993). The court interprets paragraph 5 to reserve only those claims not encompassed in the California action which ASF might have against the government. Since the claim comprising the instant action was encompassed in the California action, ASF has released the government from any liability for the claim currently sued upon.

This result is further supported by the context surrounding the settlement of the California action. Both parties note that ASF had filed its written claim with the CIA contracting officer prior to executing the settlement agreement in the California action. Clearly, ASF knew of its claim against the CIA, and knew that the contracting officer had denied it. ASF also had repeatedly claimed Air Asia was controlled by the CIA. There is no reason ASF could not have preserved its claim against the CIA in the same clear manner that it preserved its right in paragraph 4, for example, to reimbursement for potential tax liability that might result from the Burbank and North Hollywood operations:

4. This release does not extend to any rights or remedies which Plaintiff has under this Agreement. Furthermore, this release does not cover ... any claims Plaintiff has ... for indemnification, reimbursement or liability for taxes ... resulting directly or indirectly from the operations conducted at the facilities in Burbank and North Hollywood, California that gave rise to Plaintiff's above-referenced lawsuit....

Given the circumstances, ASF's failure to clearly and specifically reserve its current claim indicates that the parties did not mutually intend to do so. *Cf. In re Mission Ins. Co.*, 41 Cal.App.4th 828, 48 Cal.Rptr.2d 209, 216 (1995) ("Because appellants knew

they had a claim ... they had a duty to specifically exclude that claim from the release agreement."). Mr. Rautenberg's declaration reciting his understanding to the contrary is insufficient to overcome the unambiguous release in paragraphs 3 and 8.

## II. ASF's Contract, If Any, With The CIA Was For "Secret Services" And Is Unenforceable Under Totten v. United States.

■ Even if the release was not effective as to the present claim against the United States, there is an independent ground for dismissal. Under *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875), contracts to perform "secret services" for the United States are unenforceable in court. *Id.* at 107. The Supreme Court offered two rationales for its decision. First, an implied term in all contracts for secret services is that "the lips of the other were to be forever sealed respecting the relation of either to the matter." *Id.* at 106. And second, public policy forbids the enforcement of contracts for secret services "as the existence of a contract of that kind is itself not a fact to be disclosed." *Id.* at 107. Whatever theory undergirds the doctrine, however, it remains alive and well until the Supreme Court tells us otherwise.[10]

■ Here, ASF alleges that it entered into a covert oral contract in 1956 with respect to matters affecting foreign relations. The very nature of the services involved precluded execution of a written contract. ASF maintains that written contracts entered into by the parties in 1957, 1963, and 1966, were meant only as "cover" for the covert 1956 oral contract. The oral agreement remained a secret for nearly twenty-five years, and was not revealed publicly in any way until ASF filed its claim against E–Systems and Air Asia in the 1980s.

Confronted with markedly similar facts, the court in *Simrick v. United States*, 224 Ct.Cl. 724, 1980 WL 99699 (1980), barred recovery under *Totten*. There, the plaintiff alleged that he had agreed to "set up a business in Mauritius to act as a 'cover' for agents of the CIA" and was to provide other related services. *Id.* at 724. Mr. Simrick sought to avoid the effect of *Totten* by arguing that he was not a spy but only "an administrative employee of the CIA, sent to set up a business, run the intelligence gatherers through his business as a front operation, and manufacture ties to be sent back to the United States...." *Id.* at 726. He also argued that very little of the secret nature of the contract was left in the case. *Id.* The Court of Claims rejected his arguments, and noting that "according to plaintiff he was to engage significantly in undercover intelligence work for the Government; his alleged dealings seem to have been oral and very probably with CIA operatives not otherwise known to the public," found that *Totten* precluded any action on the contract. *Id.* at 726–27.

ASF tries to avoid *Totten* in several ways. First, it argues that the United States has not invoked *Totten*. It is true that *Totten* initially only appeared parenthetically in the government's reply brief, but it has since been invoked formally in supplemental briefing (which admittedly occurred at the prompting of the court). In any event, the "secret services" doctrine was itself announced *sua sponte* by the Court in *Totten*. See *Totten*, 92 U.S. at 106.

---

**10.** When the Supreme Court articulated the related military and state secrets doctrine in *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), the Court reaffirmed *Totten 's* vitality as a special species of military and state secret—one where "the very subject matter of the action, a contract to perform espionage, was a matter of state secret." *Id.* at 11 n. 26, 73 S.Ct. at 533 n. 26. More recently, the Court cited *Totten* for the proposition that it is against the interests of public policy to allow the maintenance of a suit in any court, the trial of which would disclose matters that " 'the law itself regards as confidential.' " *Weinberger v. Catholic*

*Action*, 454 U.S. 139, 146–47, 102 S.Ct. 197, 203–04, 70 L.Ed.2d 298 (1981) (quoting *Totten* ). Still more recently, the Federal Circuit affirmed the dismissal of claims by Vietnamese commandos employed by the United States in (now well-publicized) military operations against North Vietnam, stating: "it cannot be doubted that *Totten* stands for the proposition that no action can be brought to enforce an alleged contract with the government when, at the time of its creation, the contract was secret or covert." *Guong v. United States*, 860 F.2d 1063, 1065 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1023, 109 S.Ct. 1751, 104 L.Ed.2d 188 (1989).

Second, ASF argues that *Totten* is factually distinguishable because it has not alleged that "the parties agreed to keep the agreement *eternally* silent," and the government has not alleged any "detriment of the public." ASF misunderstands the effect of *Totten,* which implies the requisite condition of eternal silence as a matter of law, and deems any disclosure of the agreement for "secret services" to be "to the serious detriment of the public." *Id.* at 106–07; *cf. Reynolds,* 345 U.S. at 11 n. 26, 73 S.Ct. at 533 n. 26 ("The action [in *Totten*] was dismissed on the pleadings without ever reaching the question of evidence, since it was so obvious that the action should never prevail over the privilege"). The court notes, moreover, that the very contract alleged here includes silence as one of its terms. The parties' agreement, in other words, is that the contract can never be the subject of litigation because to litigate is to be in breach of the agreement.

Finally, ASF argues that the United States has waived any right to a *Totten* defense because the CIA observed the California action but failed to assert the defense at that time. Given the clandestine nature of the CIA's mission, and the fact that it would have had to intervene to be a nominal party to the suit, it is understandable that the CIA limited its involvement in the California action to a bare minimum. In addition, the court notes that plaintiff was not prejudiced by the CIA's inaction—indeed, had the CIA intervened and raised *Totten* in the California action, plaintiff might very well have received nothing at all. The court accordingly declines to find any waiver.

The court therefore decides that the alleged oral contract ASF seeks to enforce against the CIA is a contract for secret services and holds that ASF is barred under *Totten* and *Simrick* from judicially enforcing the contract.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is granted. It is unnecessary to address the government's other defenses. The clerk is directed to dismiss the complaint with prejudice. No costs.