[No. B229287. Second Dist., Div. Eight. Dec. 12, 2011.]

ANDREW GEORGE, Plaintiff and Appellant, v.
AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA et al., Defendants
and Respondents.

1114

**COUNSEL**

Browne George Ross, Browne Woods George, Michael A. Bowse and Ira Bibbero for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps and John T. Brooks for Defendants and Respondents.

OPINION

GRIMES, J.—

## SUMMARY

Plaintiff and appellant Andrew George filed a class action complaint against his automobile insurer, challenging its alleged practice of identifying a specified amount as a vehicle's "Actual Cash Value" (in plaintiff's case, $25,000) in the insurance policy but then refusing to pay that amount in the event of a total loss, instead paying the fair market value of the car at the time of the loss. Plaintiff relied primarily on the declarations page of the policy but also alleged parol evidence supported his interpretation of the policy. The trial court considered the parol evidence allegations and found they were insufficient as a matter of law to show the parties intended the policy to pay plaintiff $25,000 in the event of a total loss. The court sustained the insurer's demurrer to plaintiff's first amended complaint without leave to amend, finding it "clear and unambiguous" that the policy called for payment of the fair market value (or actual cash value, as that phrase is commonly understood) up to a limit of $25,000. We affirm the judgment.

## FACTS

In December 2007, plaintiff obtained a policy of insurance covering his 1960 Ford Thunderbird from defendant Interinsurance Exchange of the Automobile Club.[1] The car was stolen in January 2009 and never recovered, so plaintiff sustained a total loss. After plaintiff notified defendant of the loss, defendant determined the "actual cash value" of the car was $13,227, and paid plaintiff $12,977 (after applying the $250 deductible).

Plaintiff sued defendant, asserting the policy required defendant to pay $25,000 in the event of a total loss of the car, without regard to the fair market value of the car at the time of the loss. According to plaintiff, the policy declarations page "identifies a dollar amount agreed upon by the Defendants and the insured for 'Actual Cash Value' in connection with the insured vehicle." In plaintiff's case, "that identified amount was $25,000 for his 1960 Ford Thunderbird." Plaintiff alleges that defendant's "actual cash value" policies, such as his, "in defining the 'actual cash value' of the insured automobile were intended to be and were valued policies within the meaning

---

[1] Plaintiff also named as defendants two entities that did not issue the insurance policy: the Automobile Club of Southern California and ACSC Management Services, Inc. Those defendants remain parties to the appeal, but we will refer to defendants in the singular as defendant or insurer.

of [Insurance] Code [section] 412." (Under the Ins. Code, a policy is either "open or valued" (Ins. Code, § 410); a valued policy is "one which expresses on its face an agreement that the thing insured shall be valued at a specified sum" (*id.*, § 412), and an open policy "is one in which the value of the subject matter is not agreed upon, but is left to be ascertained in case of loss" (*id.*, § 411).)

The relevant insurance policy provisions are these.

First, the declarations page of the policy shows the coverages (liability, medical, physical damage, and uninsured motorist) and the limits of liability for each area of coverage. The coverage that applies to plaintiff's loss, the physical damage coverage, limits the insurer's liability to payment of the "Actual Cash Value unless otherwise stated, less deductible." The declarations page describes the categories of physical damage coverage, including comprehensive and collision, with limits of liability of $25,000 in each case, with a deductible of $250. Thus, the declarations page looks like this, in pertinent part:

| COVERAGES | LIMITS OF LIABILITY | |
| --- | --- | --- |
| [Other coverages and limits omitted] | | |
| **Physical Damage** | (Actual Cash Value unless otherwise stated, less deductible) | |
| | Vehicle 1 | [Vehicle 2 omitted] |
| Comprehensive | $25,000 | |
| (Less Deductible) | $250 | |
| Collision | $25,000 | |
| (Less Deductible) | $250 | |
| Car Rental Expense | | |
| (Per Day) | NA | |

Second, the policy provisions on physical damage describe the limits of liability for a loss other than a total loss as follows: "In the event of: [¶] (1) loss to an insured automobile described in the declarations, we will pay the actual cash value of the damaged or stolen vehicle, the limit of liability stated in the declarations or the amount necessary to repair or replace the vehicle, whichever is least . . . ." (Emphasis omitted.)

Third, the policy provisions specify the limits of liability for the total loss of an insured automobile as follows: "In the event of total loss to an insured automobile described in the declarations for which a limit of liability is stated, we will pay the actual cash value up to the limit stated in the declarations for that automobile. The loss will be reduced by the applicable deductible." (Emphasis omitted.)

Fourth, the policy provides an appraisal option in the event of a total loss: "If after a total loss . . . , the amount of loss cannot reasonably be established, either you or we can request in writing that the amount of loss be determined by appraisal." (Emphasis omitted.) The policy describes the procedure and states, "The appraisers shall then establish the amount of loss subject to our limit of liability."

In his first amended complaint, plaintiff alleged that " '[a]ctual [c]ash [v]alue,' as used in the Policy, is intended to mean and means the cash value agreed upon by defendants and the insured at the time the Policy is issued, as reflected in the Policy Declarations Page." This interpretation, plaintiff alleges, is also supported by extrinsic evidence. The extrinsic evidence "includes, but is not limited to" defendant's assessment of actual cash value through its inspection during the application process, and the increase in premiums demanded as "Actual Cash Value" increased.

The complaint alleged that during the application process, defendant required an inspection, during which defendant assessed "the physical and mechanical condition of the vehicle to evaluate its 'Actual Cash Value.' " Defendant's premiums were based on the "Actual Cash Value," and "[t]he higher the 'Actual Cash Value,' the higher the premiums." "The term actual cash value is defined for each insured vehicle on the Declarations Page following inspection of each vehicle." Plaintiff "procured and paid premiums for an insurance policy designating $25,000 for 'actual cash value' in connection with the insured automobile."

Based on these allegations, plaintiff's first amended complaint alleged causes of action for breach of contract, tortious breach of the implied covenant of good faith and fair dealing, declaratory relief, fraud, unfair and fraudulent business practices under the Business and Professions Code, and rescission based on unilateral mistake of fact.

The trial court sustained defendant's demurrer to the first amended complaint without leave to amend.[2] The court observed that the contract "was clear on its face that the limit on insurer liability is the actual cash value of the vehicle unless otherwise stated. And it's clear and unambiguous that one is paid the actual cash value up to a limit of 25 thousand dollars."

Judgment was entered and this appeal followed.

## DISCUSSION

Plaintiff's principal contention is that the trial court erred when it concluded the insurance contract was "clear on its face." Plaintiff contends the court was required, as a matter of law, to credit his allegations that extrinsic evidence "renders the insurance contract at issue here ambiguous"—that is, his "allegation that extrinsic evidence supports his construction of the Policy . . . is enough, by itself, to require that Defendants' demurrer be overruled." We conclude plaintiff misconstrues the law as it applies to the complaint in his case.

### 1. *The Law*

Our review is de novo. (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 960 [110 Cal.Rptr.3d 890] (*Hervey*).) A demurrer admits all facts properly pleaded, but not contentions, deductions or conclusions of law or fact. (*Ibid.*) We determine whether the complaint states facts sufficient to constitute a cause of action, and whether there is a reasonable probability the complaint could have been amended to so state. (*Id.* at pp. 960–961.)

■ The usual rules of contract interpretation apply to insurance policies. (See *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].) The mutual intention of the parties at the time of contracting governs interpretation, and "is to be inferred, if possible, solely from the written provisions of the contract." (*Ibid.*) "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*Id.* at p. 822.) If there is ambiguity, further rules apply to the resolution of the ambiguity. (*Ibid.*)

---

[2] Defendant demurred to the original complaint. The trial court sustained that demurrer as well, but gave plaintiff leave to amend. Plaintiff added the allegations concerning inspection of the vehicle and extrinsic evidence, and added the cause of action for rescission and reformation of the policy.

■ "Parol evidence is admissible to interpret an insurance policy if ' "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." ' " (*Hervey, supra*, 185 Cal.App.4th at p. 961.) And although parol evidence "may be admissible to determine whether the terms of a contract are ambiguous [citation], it is not admissible if it contradicts a clear and explicit policy provision [citation]." (*Ibid.*) The Supreme Court in *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641] (*Pacific Gas*), upon which plaintiff relies, discussed at some length the admissibility of extrinsic evidence to explain the meaning of a written instrument. Among other things, the court said:

■ "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas, supra*, 69 Cal.2d at p. 37.)

■ And: "The meaning of particular words or groups of words varies with the '. . . verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges). . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning.' [Citation.] Accordingly, the meaning of a writing '. . . can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended.' " (*Pacific Gas, supra*, 69 Cal.2d at pp. 38–39.)

■ And: "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding." (*Pacific Gas, supra*, 69 Cal.2d at p. 39, fn. omitted.)

A number of cases after *Pacific Gas* (which did not involve a demurrer) have discussed the propriety of sustaining a demurrer based on the plain meaning of a contract and without receiving extrinsic evidence, with differing (at least superficially) results. But all the cases, we believe, ultimately express

the same principles, and they do not support plaintiff's claim that the trial court in this case should have overruled the demurrer.

■  Before we describe those cases, a few observations are in order. After *Pacific Gas*, there is no doubt that parol evidence must be conditionally considered to determine mutual intention with respect to specified policy terms or provisions that are reasonably susceptible of more than one meaning. *Pacific Gas* does not, however, extend to the proposition plaintiff posits that a demurrer can never be sustained to a complaint so long as there is an allegation that unidentified parol evidence exists to support plaintiff's claim. In the context of a demurrer, the court must conditionally consider the parol evidence alleged in the complaint, to determine if it would be relevant to prove a meaning to which the language of the instrument is reasonably susceptible. Thus, trial courts err if they refuse to consider the alleged parol evidence on the ground that no parol evidence of any sort is pertinent because the particular contract in dispute is unambiguous. But there may be no error if the trial court conditionally accepts as true that plaintiff can proffer specified parol evidence and, having considered the parol evidence allegations, then determines as a matter of law that the parol evidence alleged must be disregarded because, for whatever reason, the contract is not reasonably susceptible of the interpretation plaintiff alleged. As we will see, that is exactly what the trial court did in this case. We turn to the cases.

In *Diamond v. Insurance Co. of N. A.* (1968) 267 Cal.App.2d 415 [72 Cal.Rptr. 862] (*Diamond*), decided a few months after *Pacific Gas*, the court concluded the trial court should have overruled the insurers' demurrers to a first amended complaint alleging a replacement cost endorsement required the insurers to pay plaintiff the replacement cost of real property, rather than the actual cash value, regardless of whether the plaintiff actually repaired or replaced the property. (*Diamond*, at p. 418.) The court concluded that the policy language, "construed by itself, is not reasonably susceptible to the construction placed upon it by plaintiff." (*Ibid.*) But this did not dispose of the matter, because the complaint also alleged that " 'the parties intended, and plaintiff so understood, that the endorsement amended his policy, so that he could recover "replacement cost" rather than "actual cash value[,"] and elect to disregard it in all respects (including the necessity of actually replacing, as provided in . . . said endorsement) . . . .' " (*Ibid.*) This allegation, the court said, brought the case within the *Pacific Gas* rule, and that rule was controlling: "We cannot anticipate what evidence the plaintiff may offer at a trial to establish the meaning which he has alleged. The mere fact that the insurance policy has a clear meaning to the judge who ruled on the demurrer and a clear meaning to the members of this court will not preclude the plaintiff from offering evidence, if he has any, to support his allegation that the policy means what he claims." (*Diamond*, at p. 419.)

*Diamond* involved the effect of an amendment to the policy and the construction of several different provisions. The complaint apparently did not identify what extrinsic evidence supported the plaintiff's allegation that the parties meant the amendment to supersede the policy provisions providing for payment of the replacement cost only in the event the insured actually replaced the property. Though the court found the plaintiff's parol evidence should be considered, the court also repeated the *Pacific Gas* principle that the parol evidence may vary the terms of a written contract only if the language of the instrument was reasonably susceptible to the plaintiff's alleged interpretation.

In this case, the trial court specifically gave plaintiff the opportunity to amend the complaint to allege parol evidence—e.g., statements made to plaintiff as to an agreed amount or "some kind of a preagreement appraisal by which the parties agree what the value of the car is." The only evidence plaintiff alleged—inspection of the car and premiums based on its value—did not address any mutual understanding of the parties, but merely plaintiff's subjective intent, flowing from the inspection and premiums, that the insurer would, contrary to the written terms of the policy, pay $25,000 for a total loss.

Later cases have also reversed trial court rulings sustaining demurrers in breach of contract cases. Plaintiff relies, for example, on a point enunciated in *Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807 [233 Cal.Rptr. 794] (*Southern Pacific Land*), where the court stated: "[T]here is no waiver by failure to plead what extrinsic evidence will be offered. Where an ambiguous contract is attached and incorporated into the complaint, the party pleading is only required to allege in a complaint the meaning which the party ascribes to that contract." (*Id.* at p. 817.) But in *Southern Pacific Land*, as the court stated, the contract was ambiguous on its face. Indeed, the Court of Appeal construed the four corners of the contract completely differently than did the trial court. (*Id.* at pp. 824–825.)

*Southern Pacific Land* involved the interpretation of an oil and gas lease, and the question was whether the lease had expired. (*Southern Pacific Land, supra,* 188 Cal.App.3d at p. 811.) The Court of Appeal concluded the defendant's demurrer should have been overruled, finding the trial court erred in refusing to consider extrinsic evidence "regarding the purpose and effect of the lease, the custom and usage in the oil and gas industry, the practical construction the parties had given the lease and the sense in which the parties had used the words." (*Id.* at p. 815.) The court cited *Pacific Gas* and rejected the defendant's contention that since the plaintiff had offered no extrinsic evidence in response to the demurrer, it should be precluded from contending on appeal that it could allege extrinsic evidence to support its allegations of

the meaning of the lease expiration terms. (*Southern Pacific Land*, at pp. 815–816.) The court concluded that "the trial court should not have ruled on the lease provisions on the assumption that the plain meaning of the words and provisions in the lease prevails." (*Id.* at p. 817.) "[T]he final interpretation of the lease should not be made without consideration by the trial court of any extrinsic evidence the parties may desire to introduce pursuant to the principles of [*Pacific Gas*]." (*Id.* at p. 825.)

*Southern Pacific Land* differs from this case in numerous respects. Despite the fact that the *Southern Pacific Land* contract was ambiguous (as demonstrated by the differing interpretations of the trial court and the Court of Appeal), the trial court concluded it would be inappropriate to receive *any* parol evidence because the lease had a plain meaning on its face. This case is different because the policy is not ambiguous, plaintiff *did* allege what parol evidence he could offer, and the trial court *did* consider the parol evidence allegations. *Southern Pacific Land* establishes that the failure to identify extrinsic evidence to the trial court, where the contract is ambiguous, did not waive the plaintiff's right to contend on appeal that parol evidence supported the plaintiff's interpretation. *Southern Pacific Land* does not stand for the proposition, as plaintiff would have it, that it is always unnecessary at the demurrer stage to even generally describe the parol evidence which would support the alleged meaning of a contract that is not ambiguous on its face.

█ Other cases overruling demurrers are likewise different from the case at bar. In *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232 [282 Cal.Rptr. 233] (*Aragon-Haas*), the court reversed a ruling sustaining the defendant's demurrer to a claim for breach of a written employment agreement which the appellate court found to be ambiguous. The court said that " '[s]o long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.' " (*Id.* at p. 239 ["Where a complaint is based on a written contract which it sets out in full, a general demurrer to the complaint admits not only the contents of the instrument but also any pleaded meaning to which the instrument is reasonably susceptible."].)

The contract in *Aragon-Haas* provided for an initial one-year term, unless terminated in accordance with another provision which permitted termination with or without cause, and " 'thereafter' " the agreement would automatically be extended for six consecutive one-year terms. (*Aragon-Haas, supra*, 231 Cal.App.3d at p. 239.) The plaintiff alleged she was told when hired that she was on one year's probation and she understood the contract provisions to mean that, after the first year, she could be terminated only for good cause. (*Id.* at p. 236.) The court found that the word "thereafter" made it "unclear

whether the right to terminate existed only during the first year of plaintiff's employment or whether that right continued throughout the term of employment specified in the contract," so the provision "thus is ambiguous and it is reasonably susceptible of the meaning alleged by plaintiff . . . ." (*Id.* at p. 239.)

In *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1 [22 Cal.Rptr.2d 229] (*Hayter Trucking*), the court also concluded the defendant's demurrer to a breach of contract claim should have been overruled. The plaintiff contended a 30-day notice of termination clause was understood and intended to require good cause to support a termination during the contract term, and that extrinsic evidence in the form of trade custom and usage supported its interpretation. (*Id.* at pp. 11–12.) Among other things, the court observed that "parol evidence may be admitted to explain the meaning of a writing when the meaning urged is one to which the written contract term is reasonably susceptible or when the contract is ambiguous. Parol evidence cannot be admitted to show intention independent of an unambiguous written instrument." (*Id.* at p. 15.) Further, while the words in a contract are to be construed according to their plain, ordinary, popular or legal meaning, "particular expressions may, by trade usage, acquire a different meaning" (*ibid.*), and parol evidence is admissible to establish the trade usage "even though the words in their ordinary or legal meaning are entirely unambiguous." (*Ibid.*)

The *Hayter Trucking* court observed that plaintiffs sometimes allege breach of a written contract by attaching the contract as an exhibit to the complaint and incorporating it into the complaint without alleging the terms of the contract have any special meaning. In such cases, "a court will construe the language of the contract on its face to determine whether, as a matter of law, the contract is reasonably subject to a construction sufficient to sustain a cause of action for breach."[3] (*Hayter Trucking, supra,* 18 Cal.App.4th at p. 18.) But "[w]here an ambiguous contact is attached and incorporated into the complaint, the pleader is only required to allege in the complaint the meaning which he or she ascribes to that contract." (*Ibid.*) The plaintiff in *Hayter Trucking* "satisfied pleading requirements by alleging the meaning which it ascribed to the termination provisions of the contract." (*Ibid.*) The court explained: "[T]he traditional parol evidence rule allowed extrinsic evidence to give meaning to a writing only when the writing wasambiguous. In 1968[, in *Pacific Gas*], the California Supreme Court liberalized the traditional rule by rejecting the 'plain meaning rule.' Hence,

---

[3] (See also *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1561 [260 Cal.Rptr. 237] [trial court's ruling sustaining a demurrer based upon the court's interpretation of an attached written instrument will be set aside "only where the plaintiff alleges the meaning which he ascribes to an ambiguous writing attached to and incorporated into the complaint"].)

extrinsic evidence relevant to interpretation can no longer be barred simply because of a judicial determination that a writing appears to have only one interpretation. [Citations.] Parol evidence is now admissible to show mutually shared meanings of words used irrespective of their ordinary meaning. [Citation.] Most importantly, parol evidence of custom and usage is similarly admissible to interpret the written words." (*Hayter Trucking, supra,* 18 Cal.App.4th at p. 20.) *Hayter Trucking* thus concluded the trial court "should not have ruled on the termination provisions of the contract on the assumption the plain meaning of the words and provisions in the [documents] prevailed." (*Hayter Trucking, supra,* 18 Cal.App.4th at p. 21.)

In *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97 [55 Cal.Rptr.3d 621] (*Fremont*), the court reiterated the general principles announced in *Pacific Gas* (as do many cases arising in the context of summary judgment or trial): "The proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous. An ambiguity may appear on the face of a contract, or extrinsic evidence may reveal a latent ambiguity. [(*Pacific Gas, supra,* 69 Cal.2d at pp. 37–39.)] A court determining whether a contract is ambiguous *must first consider extrinsic evidence offered to prove the parties' mutual intention.* If the court determines that the contract is reasonably susceptible of an interpretation supported by extrinsic evidence, the court must admit that evidence for purposes of interpreting the contract. [Citation.] *A court cannot determine based on only the four corners of a document, without provisionally considering any extrinsic evidence offered by the parties, that the meaning of the document is clear and unambiguous.* [Citation.] Instead, a court must provisionally consider extrinsic evidence offered by the parties in the manner we have stated." (*Fremont, supra,* 148 Cal.App.4th at p. 114, fn. omitted, italics added; see *id.* at p. 115 [holding that a court ruling on a demurrer cannot take judicial notice of the proper interpretation of a document submitted in support of the demurrer].)

Other cases involving demurrers in insurance matters have sustained demurrers, or otherwise reflect the principles the trial court properly applied in this case.

In *Hervey, supra,* 185 Cal.App.4th 954, the court affirmed the trial court's ruling sustaining the insurer's demurrer without leave to amend, "because the policy was not reasonably susceptible to Hervey's interpretation of it." (*Id.* at p. 958.) The plaintiff did not plead parol evidence to support her interpretation of the policy. (*Id.* at p. 963.) She did, however, as does plaintiff here, rely on the declarations page, and on a heading on an endorsement, to support her claim of ambiguity in the policy "so that she should be given the opportunity to introduce parol evidence." (*Id.* at p. 964.) The court found no ambiguity, observing that the heading "is not an operative term or provision itself," and "the declaration does not purport to set forth or define the operative terms.

Thus, any ambiguity in the declaration 'is resolved by' the terms of the policy." (*Id.* at p. 965.) And, "to the extent Hervey's understanding of the policy is contrary to its explicit language, her subjective intent is not relevant." (*Ibid.*)

In *Palacin v. Allstate Ins. Co.* (2004) 119 Cal.App.4th 855 [14 Cal.Rptr.3d 731] (*Palacin*), the court stated the following rule: "Applying these rules [of insurance policy construction] at the pleading stage, an insurer moving for a demurrer based on insurance policy language must establish conclusively that this language unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint. [Citation.] To meet this burden, an insurer is required to demonstrate that the policy language supporting its position is so clear that parol evidence would be inadmissible to refute it. [Citation.] Absent this showing, the court must overrule the demurrer and permit the parties to litigate the issue in a context that permits the development and presentation of a factual record, e.g., summary judgment or trial." (*Id.* at p. 862 [sustaining insurer's demurrer but giving plaintiff the opportunity to amend her complaint].)

*Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457 [282 Cal.Rptr. 389] (*Columbia Casualty*), upon which *Palacin* relies, is to the same effect, and stated the point this way: "The motion for judgment on the pleadings can be granted only if the instrument incorporated by reference conclusively negates the express allegation in the pleading, and except in the extraordinary case, conclusive negation is unlikely because of the inevitable prospect that parol evidence may lead to an interpretation of the contract consistent with the pleading's express allegation." (*Columbia Casualty*, at p. 470.) Thus, "[t]he terms of a writing incorporated by reference which rebut an allegation of the pleading may conceivably be so clear and simple that parol evidence will be inadmissible to refute them." (*Id.* at p. 469.) *Columbia Casualty*, like other cases, noted that *Pacific Gas* liberalized the traditional parol evidence rule (which allowed extrinsic evidence only when the writing was ambiguous) by rejecting the plain meaning rule: "extrinsic evidence relevant to interpretation can no longer be barred simply because of a judicial determination that a writing appears to have only one interpretation." (*Columbia Casualty*, at p. 470, fn. 3.) Parol evidence "is now admissible to show mutually shared meaning of words used irrespective of their ordinary meaning," and "[p]arol evidence of custom and usage is similarly admissible to interpret the written words." (*Ibid.*)

## 2. *This Case*

None of the cases just described enunciates the principle plaintiff suggests—that a mere allegation of unidentified extrinsic evidence requires a demurrer to be overruled. They are all consistent with our initial observations: the trial court must provisionally consider parol evidence allegations,

but unless those allegations would support an interpretation to which the contract is reasonably susceptible, a demurrer is properly sustained.

Thus, in most of the demurrer cases (such as *Southern Pacific Land*, *Aragon-Haas* and *Hayter Trucking*), an ambiguous contract is attached to a complaint alleging that one provision or another means something other than the meaning that would ordinarily attach to those words, because the parties intended a special meaning or the words had acquired a special meaning through trade usage. And many cases (including *Diamond* and *Fremont*) say that a court can never determine that the meaning of a document is clear and unambiguous without provisionally considering any extrinsic evidence offered by the parties. On a demurrer, the court must consider the sufficiency of the allegations, including any parol evidence allegations, to determine whether the contract is reasonably susceptible to the plaintiff's alleged interpretation.

The trial court here *did* consider plaintiff's parol evidence allegations, and correctly determined they were insufficient as a matter of law to show the parties intended the policy to pay plaintiff $25,000 in the event of a total loss. Plaintiff simply did not offer parol evidence that could establish a mutual understanding between him and the insurance company, or custom or usage, explaining what they understood any term or provision to mean. And, as the courts recognized in *Palacin* and *Columbia Casualty*, insurance policy language may "unambiguously negate[] beyond reasonable controversy the construction alleged in the body of the complaint." (*Palacin, supra*, 119 Cal.App.4th at p. 862.) In a case such as this one, where the insurance contract is not reasonably susceptible to the meaning alleged in the complaint, it is proper to sustain a demurrer without leave to amend.

Plaintiff has not identified a particular term or specific words in the policy that he claims have a meaning different from their ordinary meaning. Instead, he alleges that the parties agreed that a specified amount—$25,000—was (and would always be, in the event of loss at any time during the policy period) the actual cash value of the insured vehicle "as reflected in the Policy Declarations Page." But the policy itself—including the declarations page— precludes plaintiff's allegations as a matter of law. The declarations page contains no statement of "cash value agreed upon by defendants and the insured . . . ." The declarations page shows coverages and limits of liability. It expressly states the limit of liability—the *most* the policy will pay, not *the amount* the policy will pay—is $25,000, less the $250 deductible.

The declarations page, when read together with the rest of the policy, unambiguously provides that in the event of a total loss, the policy will pay the actual cash value of the car *up to $25,000*, less the deductible.

The ordinary meaning of these words is that if the car is stolen and forever lost, the policy will pay the fair market value, or actual cash value, of the car on the date of the claim, less the deductible, but in any event, not more than $25,000. Thus, if during the policy period and on the date of loss, there was an increased market demand for a 1960 Ford Thunderbird, for whatever reason, and buyers could be found who were willing to offer more than $25,000, the policy nonetheless would pay only $25,000. If, in contrast, the market value of a 1960 Ford Thunderbird declined, and in the years after the policy was purchased, a fair sale in the open market would not yield more than $13,227, then that is the amount due under the policy, less the $250 deductible.

Nothing in the declarations page supports the allegation that $25,000 is anything other than a limit of liability. Moreover, as the court explained in *Hervey*, "the declaration [page] does not purport to set forth or define the operative terms. Thus, any ambiguity in the declaration 'is resolved by' the terms of the policy." (*Hervey, supra*, 185 Cal.App.4th at p. 965; see also *United Services Automobile Assn. v. Baggett* (1989) 209 Cal.App.3d 1387, 1397 [258 Cal.Rptr. 52] ["Any potential uncertainty about the abbreviations on the declarations page is resolved by reference to the policy's section entitled 'limit of liability' explaining there were maximum limits . . . ."].)

Plaintiff's allegations would render the operative provisions of the policy nonsensical. (Cf. *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764] ["Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists."].) Plaintiff's interpretation would also render meaningless the provision of the policy in which the parties agreed, in case of a total loss, to appraisal procedures for establishing the amount of loss (subject to the insurer's liability limit). Such a procedure would be entirely unnecessary if the insurer had agreed, as plaintiff claims, to payment of $25,000 irrespective of the actual value of the car on the date of loss.

If this were not enough, we note as well that the complaint alleges (as was necessary to attain the desired result) that the insurance policy here is a valued policy: that is, it "expresses on its face an agreement that the thing insured shall be valued at a specified sum." (Ins. Code, § 412.) As we have seen, the policy does no such thing. The declarations page does not show "on its face" (or otherwise) an agreement to value the vehicle at $25,000, and the operative terms, as just discussed, confirm the contrary, namely that the insurance policy "is one in which the value of the subject matter is not agreed upon, but is left to be ascertained in case of loss." (Ins. Code, § 411; cf. *Elliano v. Assurance Co. of America* (1975) 45 Cal.App.3d 170, 180 [119 Cal.Rptr. 653] ["A valued policy is 'seldom if ever written in this state' since it is subject 'to the moral hazard of over evaluation.' "].)

The trial court was not required to credit plaintiff's allegations that extrinsic evidence "renders the insurance contract at issue here ambiguous," because the language of the policy "unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint." (*Palacin, supra,* 119 Cal.App.4th at p. 862.) Under these circumstances, the rule that extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract applies. (See *Hervey, supra,* 185 Cal.App.4th at p. 961 [although parol evidence "may be admissible to determine whether the terms of a contract are ambiguous [citation], it is not admissible if it contradicts a clear and explicit policy provision"].)

This is not a case where the allegations of the complaint show a "possibility that the parties chose the language of the instrument to express different terms" or where "the parties' understanding of the words used may have differed from the judge's understanding." (*Pacific Gas, supra,* 69 Cal.2d at p. 39.) This complaint, rather, alleged that the parties agreed to value plaintiff's 1960 Ford Thunderbird at $25,000, "as reflected in the Policy Declarations Page," which contains limits on liability, not an agreement on value. In other words, plaintiff claims that "actual cash value" means $25,000, without alleging any words of the policy, ambiguous or otherwise, that support that construction. Under these circumstances, the demurrer to plaintiff's breach of contract claim was properly sustained without leave to amend.

### 3. *Plaintiff's Other Causes of Action*

Plaintiff's next claim is that the demurrers to his fraud, unfair competition and reformation causes of action should have been overruled. We disagree.

In his fraud cause of action, plaintiff alleged defendant represented it would pay "the amount identified as the 'actual cash value' on the Declarations Page in the event of a total loss," and made those representations "in the Policy and Declarations Page." The complaint alleged these representations "were also implicit in Defendants' practice of demanding higher insurance premiums for 'Actual Cash Value' policies and in Defendants' practice of increasing their premiums if the designated 'Actual Cash Value' was increased—even though the designated 'Actual Cash Value' was higher than Defendants would designate as the 'replacement value' or 'fair market value' of the insured vehicle."

Further, in making these representations in the policy, defendant "omitted and concealed" material facts: "that the dollar amount specified in the Declarations page under 'Actual Cash Value unless otherwise stated' was not intended by them to reflect the 'actual cash value' of the insured automobile,"

and that " 'Actual Cash Value' was intended to have the same meaning as 'fair market value' and 'replacement cost,' even though those terms were used elsewhere in the Policy." Plaintiff alleged defendant had a duty to disclose those material facts; "[t]hrough their statements [in the policy], Defendants actively concealed those material facts," rendering their other statements incomplete and misleading; and defendant intended plaintiff and other class members to rely on the misrepresentations.

Plaintiff contends these allegations support a claim for fraudulent omission "in light of Defendants' numerous implied and express statements suggesting that Plaintiff was purchasing a policy that would pay him $25,000 (less his deductible) in the event he suffered a total loss . . . ." Plaintiff's contention necessarily fails in light of our conclusion that the policy is clear and unambiguous, and nowhere suggests, much less states, that the policy would pay him $25,000 for a total loss. That being so, the allegation that defendant "omitted and concealed" the material facts just described cannot serve as the basis for a fraud claim.

On appeal, plaintiff argues that defendant failed to disclose facts required to be disclosed by Insurance Code section 332, and that this failure to disclose was actionable fraud. Section 332 provides that "[e]ach party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

Plaintiff contends Insurance Code section 332 required defendant to disclose two facts: "that they had determined that the amount they would be required to pay Plaintiff in the event of a total loss of his vehicle was substantially less than $25,000," and that "Plaintiff received nothing of value for the premiums he paid that exceeded the amount he would have been charged had the policy limit been approximately equivalent to the value of Plaintiff's car as Defendants had determined it." This assertion is implausible on its face because it charges insurer with knowing what the actual value of a classic car will be at some point in the future when a total loss occurs. Section 332 applies only when the insurer knows something "which the [insured] has not the means of ascertaining." Plaintiff has not alleged he did not know or could not ascertain the actual value of his car at the time the policy was issued so as to pay a lower premium covering a lower "Actual Cash Value," or that insurer knew when it issued the policy in 2007 that the car would be worth only $13,227, or some other amount less than $25,000, in 2009. Plaintiff's reliance on section 332 is thus misplaced.

Next, plaintiff contends his complaint adequately alleged that defendant's conduct was unfair and fraudulent under the unfair competition law. To state a cause of action under the "fraudulent" prong of the unfair

competition law, "it is necessary only to show that 'members of the public are likely to be deceived.' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].) A practice may be unfair even if it is not fraudulent or unlawful; "the 'unfairness' prong 'has been used to enjoin deceptive or sharp practices.' " (*Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 970 [69 Cal.Rptr.2d 623].) This cause of action necessarily fails, too, because a contract of insurance that is clear and unambiguous on its face cannot at the same time be deceptive, misleading, or a "sharp practice[]." (*Ibid.*)

Finally, plaintiff claims that his reformation claim based on unilateral mistake should have survived defendant's demurrer. He is again mistaken.

Under Civil Code section 3399, "[w]hen, through . . . a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention . . . ." Plaintiff alleged that he entered into the contract believing he would receive $25,000 for a total loss of his vehicle, and defendant "[was] aware or had reason to know of Plaintiff's mistake of fact at the time the Policy was issued."

█ Plaintiff's bare, conclusory allegations are insufficient to state a cause of action for reformation based on mistake. "[I]n a suit for reformation of a contract for mutual mistake, in the absence of a clear recitation of facts showing how, when and why the mistake occurred, the pleading is inadequate as against a general and special demurrer." (*Girard v. Miller* (1963) 214 Cal.App.2d 266, 273 [29 Cal.Rptr. 359].) The same was true in *Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064 [87 Cal.Rptr.3d 310], where the claimant contended he could state a cause of action for reformation based on mutual mistake or unilateral mistake known or suspected by the other party: "We do not find that single, conclusory allegation sufficient to state a cause of action for reformation based on mistake. [The claimant] must be able to allege facts showing that he and Mercury agreed to coverage terms providing him with [the coverage he alleged], and that he thereafter accepted the policy issued to him by Mercury under the mistaken belief that it provided such coverage." (*Id.* at p. 1073.) In *Mercury*, an endorsement advised the claimant "in clear and explicit language" that the policy did not in fact afford him the coverage he alleged, but he "nonetheless accepted the policy without question . . . ." (*Id.* at p. 1074.) The court found as a matter of law the insured would not be entitled to reformation, because the facts showed "that either [the insured] was not actually concerned about [the alleged coverage], or that he violated a legal duty" by ignoring a prominent warning not to sign the agreement before reading and understanding it. (*Ibid.*)

Plaintiff relies on *Carpenter v. Froloff* (1939) 30 Cal.App.2d 400, 408 [86 P.2d 691], where the court held that a mistake of one party, known or suspected by the other, could support reformation. But there, as the court observed: "The facts showing how the mistake was made, whose mistake it was, and what brought it about, are clearly set forth . . . ." (*Id.* at p. 409 ["The pleadings herein allege what the real agreement was, and what the agreement as reduced to writing was, and where the writing failed to embody the real agreement."].) In this case, plaintiff makes only the conclusory allegation that defendant was aware of his belief that the policy called for payment of $25,000 for a total loss. That is not enough. The trial court correctly concluded that plaintiff "has not pleaded facts creating an inference that defendant knew that plaintiff was under a mistaken misimpression as to the meaning of the insurance contract."

## DISPOSITION

The judgment is affirmed. Defendants are to recover their costs on appeal.

Bigelow, P. J., and Flier, J., concurred.

A petition for a rehearing was denied January 10, 2012, and appellant's petition for review by the Supreme Court was denied March 28, 2012, S199559.